**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2372-23

NEW JERSEY DEPARTMENT
OF ENVIRONMENTAL
PROTECTION, SOLID WASTE
COMPLIANCE AND
ENFORCEMENT,

      Petitioner-Respondent,

v.

CHARLES SIMSEK,

      Respondent-Appellant.

_____

          Submitted May 7, 2025 – Decided July 9, 2025

          Before Judges Marczyk and Torregrossa-O'Connor.

          On appeal from the New Jersey Department of Environmental Protection.

          Foster & Mazzie, LLC, attorneys for appellant (Boris Glazman, on the brief).

          Matthew J. Platkin, Attorney General, attorney for respondent (Donna Arons, Assistant Attorney General, of counsel; William T. Rozell, Deputy Attorney General, on the brief).

PER CURIAM

Appellant, Charles Simsek, appeals from the March 8, 2024 order of the New Jersey Department of Environmental Protection (NJDEP) Commissioner (Commissioner), finding appellant operated in excess of the limitations of his solid waste self-generator transporter registration, N.J.A.C. 7:26-3.2(c), and imposing a $25,000 civil administrative penalty assessment after a hearing conducted by the Office of Administrative Law (OAL). Affording the strong deference due to administrative decisions, we affirm.

I.

A.

The record reveals the following relevant facts and procedural history. In late 2017, the NJDEP issued a Notice of Violation (NOV) against appellant for collecting non-self-generated solid waste for disposal without possessing the requisite A901 license or a certificate of public convenience and necessity (CPCN). Appellant sent a response to the NOV approximately one month later, advising of his intent to file for the required A901 license. The NJDEP followed up with a compliance evaluation on February 4, 2019 and discovered that appellant never applied for the A901 license. Consequently, it issued an Administrative Order providing notice that it was assessing total penalties

against appellant in the amount of $25,000.  Appellant challenged, the order and requested an OAL hearing.

At the April 2023 hearing before the Administrative Law Judge (ALJ), the NJDEP presented Lawrence Lewis, a supervisor of the Transportation Oversight Unit for the NJDEP, Bureau of Hazardous Waste, responsible for "ensuring that all registered transporters in . . . New Jersey are adhering to the regulations . . . pertaining to the solid waste transportation[ and] the hazardous waste transportation."  Lewis explained that an A901 license is required "in order to . . . engage[] in the business of solid and/or hazardous waste transportation, collection, treatment, disposal and storage of waste in . . . New Jersey."

He further explained that an exception to the A901 license requirement is the "self[-]generator exemption," which applies to companies that "self[-]generate waste . . . as a part of their day[-]to[-]day operations," allowing them to "transport only thei[r] own self[-]generated waste."  According to Lewis, "[t]he self[-]generator would only be able to transport waste solely generated by the applicant[s] themselves" and "cannot transport third party generated waste because that would be waste that would be required to be transported by someone [who] has an A901 license, a CPCN, and a licensed vehicle

registration." Lewis testified that to satisfy the "self[-]generator exemption," N.J.A.C. 7:26-3.2(a) mandates that applicants register with the NJDEP which can take one month, describing the process as "not as intrusive as . . . applying for the A901 [license]."

It is undisputed that appellant did not possess an A901 license; instead, he registered with the NJDEP as a self-generator. Specifically, appellant's "application [wa]s solely for the collection, transportation, treatment, storage or disposal of solid or hazardous waste <u>generated by the applicant</u> who is not a commercial waste business." (Emphasis added).

On March 5, 2019, the Chief of the Bureau of Hazardous Waste Compliance and Enforcement issued a Notice of Civil Administrative Penalty Assessment (NOCAPA), alleging three violations against appellant, including that he: (1) "exceed[ed] the limitations of [appellant's] self[-]generator registration" in violation of N.J.A.C. 7:26-3.2(c);[1] (2) "engag[ed] in the business of solid waste transportation without an A901 license," in violation of N.J.A.C.

---

[1] N.J.A.C. 7:26-3.2(c) prohibits persons from "engag[ing] in the transportation of solid waste . . . if such an operation does not meet the transporter requirements listed in this subchapter."

7:26-16.3(a);[2] and (3) "fail[ed] to obtain a [CPCN] prior to engaging in the business of solid waste collection and disposal," in violation of N.J.A.C. 7:26H-1.6(a).[3]

Lewis testified that Ronald Feehan, a retired NJDEP investigator, conducted the investigation that led to the issuance of the NOCAPA. Lewis testified that Feehan reported that a Code Official, Sarah Paris, provided "three letters from a hauler which were used as an excuse by a property owner[,] [Eidan Derhi,] for not cleaning up his property on time." Feehan's report was admitted into evidence and reflected that Derhi gave Paris "three unsigned letters," which Feehan described as:

> from [appellant] on station[a]ry reading "Charles G. Simsek Disposal, [NJ]DEP number 27553," phone number "[***-***-****]" to Mr. [Derhi] dated 8/27/2017, 9/13/2017 and 10/8/2017 appear to be evidence [appellant] intended to engage in the business of solid waste collection.
>
> The 10/8/17 letter specifically offers roll-off service and indicates a refund will be issued . . . .

---

[2] N.J.A.C. 7:26-16.3(a) prohibits persons from "engag[ing] or continu[ing] to engage in the collection, transportation, treatment, storage, transfer or disposal of solid waste or hazardous waste . . . without a license."

[3] N.J.A.C. 7:26H-1.6(a) prohibits persons from "engag[ing] in the business of solid waste collection or solid waste disposal" without a CPCN.

Feehan added that he "reviewed . . . [Derhi's] correspondence to . . . Paris and it is clear from the photos and body of correspondence that bulky solid waste had been accumulated for collection placed in[] front of [Derhi's] house near the curb."

Lewis testified that Paris sent an email on November 28, 2017 to Feehan, attaching a response from Derhi, "a final [NOV to appellant,] . . . and a scan." The final NOV noted three inspection dates for Derhi's property and indicated that Paris observed Derhi's premises, describing it as "a residential site and there was another company that was housed there[.]  [I]t was also storing trucks and different types of equipment."

Lewis identified the three letters purportedly sent from "Charles G. Simsek Disposal" addressed to Derhi, which were entered into the record.  The letters displayed "Charles G. Simsek Disposal" letterhead and a phone number that another investigator testified he verified was appellant's.

The first letter was dated August 27, 2017, and included appellant's NJDEP registration number.  It read:

> Dear Eidan Derhi,
>
> Unfortunately, we are unable to pick up your bulk waste due to a high traffic volume on your road.  We attempted to contact you multiple times at the number provided but have not heard back.  Please contact us as

A-2372-23

soon as possible to discuss alternative options so that we can resolve this issue. I can be contacted at [***-***-****] throughout the week.

Sincerely,
Charles Simsek.

A second letter, dated September 13, 2017, also contained appellant's NJDEP

number and stated:

Dear Eidan Derhi,

Please note that this is our [s]econd attempt to contact you. We attempted to call you the other day but were unable to reach you. We are unable to pick up your bulk waste due to a high volume of traffic on your road. Please contact me at [***-***-****] to discuss alternative options such as a roll-off service.

Sincerely,
Charles Simsek.

A third letter, dated October 8, 2017, provided:

Dear Eidan Derhi,

Please note that this is our [t]hird attempt to contact you. We have attempted to contact you at the phone number on file [***-***-****] and via [l]etter but have been unable to reach you. Unfortunately, we are unable to fulfill your scheduled bulk pick[-]up appointment due to the location of your property. Due to high traffic volume [on your street], we are unable to park for long enough to load our truck. What we CAN offer is a roll-off service[.] [W]e can drop a dumpster off in your driveway and pick it up as soon as you fill it. Please

7

give us a call as soon as possible to [***-***-****] to schedule the alternative service.

We will be issuing a refund to your method of payment, as we have been attempting to contact you without success. Please contact us as soon as possible to reschedule for a roll[-]off service, if that works for you.

Sincerely,
Charles Simsek.

According to Lewis, appellant could not "legally pick up bulk waste that someone else left on a curb," and was not permitted to "drop off a dumpster for someone else to fill," "contract or accept money to pick up waste," or "drop off or pick up a dumpster in New Jersey" because appellant "d[id] not have the necessary A901 license [or a CPCN]."

Lewis testified regarding an email Feehan sent to appellant's assistant Dolores Karau at the address provided by appellant on his registration renewal form, attaching "[Derhi]'s response[,] . . . the three letters, and a[n] initial registration pdf." The email communicated that appellant was violating his NJDEP transporter registration by engaging in the business of solid waste transportation without an A901 license and warned: "These are serious infractions and include penalties of approximately $25,000 or more if a formal enforcement action is initiated against you." The email further demanded a response no later than November 5, 2017 "as to why [appellant] falsely certified

8

the affidavit included in [his] initial application and why the [NJDEP] should not [initiate an] enforcement action to revoke [his] NJDEP transporter registration."

Lewis was unaware whether Feehan had called appellant by phone to notify him of the violations, although Lewis explained that whether the NJDEP's notice is done telephonically "depends on the nature of the investigation being conducted." Lewis explained that the NJDEP issued a December 2017 NOV that "g[a]ve [appellant] an opportunity to respond to the violations." The NOV was sent to "warn" appellant and "provide [him] with an opportunity to voluntarily investigate the matter and[] take corrective action to address the identified violation(s)." It further notified appellant that his "voluntary action c[ould] prevent formal enforcement orders and penalties issued by the [NJDEP]."

The NOV advised appellant that he committed a violation of N.J.A.C. 7:26-3.2(c) as he was "limit[ed] . . . to transporting and disposing of solid waste [he] self-generated," but "did not self-generate the bulky waste left behind by tenants at the Derhi property." It further stated that appellant violated N.J.A.C. 7:26-16.3(a) by "engag[ing] or continu[ing] to engage in the collection, transportation, treatment, storage, transfer or disposal of solid waste or

9

hazardous waste . . . without a license," noting that appellant "lack[ed] an A901 license to engage in the solid waste collection, transportation and disposal industry in New Jersey" and also "lacked a CPCN to engage in the business of solid waste in New Jersey," in violation of N.J.A.C. 7:26H-1.6(a).

Lewis testified that appellant responded to the NOV and did not deny writing the letters that were the subject of the investigation. Appellant's Compliance Response Form stated:

> Derhi hires me periodically to do demo work and site cleanup at his various properties. I am a demolition and site work contractor. I have excavation and machinery which are used for this type of work.
>
> In November I was hired to clean up the property and thereafter disposed of my self[-]generated debris.
>
> I intend to file for a[n] A901 license to avoid any future misunderstandings.

Appellant also testified at the hearing, explaining that in 2017 he was a general contractor and performed excavation, demolition, and paving. He was self-employed and performed all physical work himself. He explained that since he "was[ not] supposed to be picking up [any] garbage whatsoever," he began offering services to Derhi, who was a welder, in 2015, placing a "container on

the ground"[4] on Derhi's property from which he would pick up "wood, the stockade fence[,] and the tree wood and stuff like that because that's a recycle." He claimed he lawfully offered this service and did not need a license to collect those items. Appellant stated he did not charge Derhi for his services, but admitted he sold Derhi "a bunch of steel" for Derhi to use for welding purposes. Appellant claimed he never "haul[ed] any waste," never sent any of the three letters, and never authorized anyone on his behalf to write the letters.

Aside from receiving the NOV and the Final NOV in the mail, appellant claimed he never received a call or emails from the NJDEP to discuss the three letters, although he conceded he was "not very good with email" and admitted the emails were sent to the email address he provided the NJDEP. He later stated he learned of the letters and became aware of the NJDEP's allegations against him after 2017, when he received a call from Feehan. Nevertheless, appellant admitted he never attempted to investigate who wrote the three letters, and when asked whether he was concerned that someone else wrote the letters, he responded, "I will be once I found out what happens here today, and I will go to an investigator." Appellant testified that, although six years had passed since

---

[4] On cross-examination, appellant described the container as "a twenty[-]yard box" or "roll-off container" and later testified he told Derhi not to use the box as a container.

he learned of the allegations against him, he had not contacted the police about someone potentially "using [his] name" because he had "broken elbows" and was assisting his mother who broke her hip. Appellant distinguished his letterhead from that depicted on the three letters, pointing to differences in the company name, the style, and the fonts on the letterheads.

Karau testified she did not author the three letters, noting the letters bore different letterheads than those she used when drafting memoranda and invoices to clients. She claimed she did not recall receiving any emails from Feehan, however, she testified that it was "possible . . . it was an oversight on [her] part."

## B.

The ALJ issued a written decision on July 28, 2023, finding Lewis credible, as he was "straightforward and direct" in his testimony. He similarly found Karau credible, as she was "direct and forthright in her responses."

However, the ALJ found appellant's testimony "not credible," noting that "[m]uch of [appellant's testimony] simply did not make sense." The ALJ explained that appellant "testified that he was concerned . . . someone was using his name on the three letters," but "his response to why he did nothing about it made little sense." He further found that appellant's "response to the [NOV] does not jive with his testimony," as the response to the NOV indicated "Derhi

12

hired him to clean up the property and dispose of his self[-]generated waste," but his testimony "indicated he only dropped off the container for welding." The ALJ noted that appellant contradicted himself, as he first "testified that no one from the [NJ]DEP called him," but "[l]ater . . . testified that he spoke with . . . Feehan and inquired about the three letters." Ultimately, the ALJ found appellant's "answers . . . intentionally vague" and "largely non-sensical."

The ALJ further found "[t]he three letters . . . De[rh]i produced to . . . Paris imply that [appellant] contracted to remove solid waste from the De[rh]i property," and "[g]iven the totality of the evidence," the ALJ "infer[red] that those letters were produced by [appellant]." The ALJ focused on appellant's failure to deny the allegations in his written response to the NJDEP NOV, and found his "non-sensical" testimony that he was hired to perform site cleanup for only recyclable wood to be "entirely tailored to explain away what [wa]s evident: He was engaged in the business of transporting solid waste from the De[rh]i property."

The ALJ reviewed the photographs in evidence and determined "the bulk waste on the De[rh]i property certainly me[]t the . . . definition" of solid waste under N.J.A.C. 7:26-1.6(a). Thus, he reviewed the applicable code provisions and concluded that the NJDEP "met its burden of proof that [appellant] exceeded

the limitations of his A901 exempt self-generator NJDEP transporter registration in violation of" the applicable code provisions. The ALJ upheld the $25,000 total penalty for the violations.

C.

On August 7, 2023, appellant submitted "exceptions to the initial decision," arguing the NJDEP relied on "unreliable, uncredible, and incompetent evidence that fail[ed] to address . . . why . . . [appellant], who knew about the limitations of his A901 self-exempt generator license[,] . . . [would] send letters that were unsigned, had the wrong style, font and company identification" in the letterhead, to an individual with whom appellant argued he had no agreement for payment of services.

On March 8, 2024, the Commissioner issued a Final Decision "adopt[ing] the ALJ's conclusion that the [NJDEP] . . . met its burden of proof that [appellant]" committed the alleged violations, and further "adopt[ed] the ALJ's conclusion that the penalties assessed in the []NOCAPA are both reasonable and consistent with the findings in the []NOCAPA and the [NJDEP]'s penalty assessment provisions."

The Commissioner first noted, after having "independently review[ed] the record," that "[e]ach of [appellant]'s exceptions revolve[d] around the

credibility, competency, and admissibility of the evidence underlying the [NJDEP]'s determinations and the ALJ's findings and conclusions, particularly the three letters from [appellant] to the owner of the property." The Commissioner found "the ALJ properly admitted and relied on" the three letters, as: (1) "the ALJ relied on significant circumstantial evidence to show that . . . [appellant] authored the letters, including that the letters show [appellant]'s name and letterhead, [NJ]DEP registration number, and cell phone number," (2) the letters "purport to conduct business with [Derhi] with whom [appellant] admits to having a prior business relationship," (3) "testimony deemed credible from and the reports prepared by a[n] [NJDEP] investigator show the letters were provided by [Derhi], who received them from [appellant]," and (4) appellant never "den[ied] authoring the letters in his responses to the NOV or []NOCAPA."

The Commissioner further determined that because the ALJ "ha[d] the benefit of hearing witnesses and observing their demeanor," and "[wa]s generally in a better position to determine the credibility of witnesses and their testimony," there was "no basis . . . to conclude that the ALJ's credibility determinations were arbitrary or were not based on sufficient competent evidence in the record."

The Commissioner "concur[red] with the ALJ that [appellant] admitted in his response to the [NJDEP]'s NOV that he contracted" to perform cleanup services for Derhi. He cited appellant's admission as additional evidence beyond the three letters, as well as appellant's testimony, and other "relevant and competent evidence in this matter," to adopt the ALJ's findings and concluded the NJDEP met its burden to show that violations occurred and reasonable penalties were assessed.

This appeal followed.

## II.

Appellant argues on appeal that the ALJ findings, as adopted by the Commissioner, were not based on "substantial and credible evidence," but instead rested exclusively on hearsay in the three letters he is alleged to have sent to Derhi. He specifically asserts: (1) the ALJ relied on the letters that "were unsigned, . . . unauthenticated, . . . constituted multiple levels of hearsay, and did not satisfy the residuum rule," as the record lacked "legally competent evidence that [appellant] produced the three letters" because the NJDEP did not present witnesses to authenticate them; (2) the ALJ's credibility determination was not based on "substantial and competent evidence that [appellant] authored the three letters and therefore engaged in the business of transporting solid

waste"; and (3) the NJDEP's assessment of penalties against appellant was "arbitrary and capricious," as there was no reasonable basis to conclude that appellant authored the three letters.

Although recognizing hearsay evidence is permitted in administrative proceedings under N.J.A.C. 1:1-15.5(a), subject to judicial discretion, appellant argues that "[u]nder the residuum rule, N.J.A.C. 1:1-15.5.5(b), hearsay is admissible in administrative hearings to corroborate other, non-hearsay evidence," citing Hemsey v. Board of Trustees, Police & Firemen's Retirement System, 393 N.J. Super. 524, 534 (App. Div. 2007). Appellant also cites to Dolan v. City of East Orange, 287 N.J. Super. 136, 145 (App. Div. 1996), in support of his contention that the letters, unsworn and unsigned, were inadmissible hearsay.

The NJDEP contends "there was more than sufficient competent evidence to support the factual findings." It argues "the record includes the three letters, which . . . are statements by a party[-]opponent, excluded from the hearsay rule," "offered by . . . [the NJ]DEP as statements made to . . . Derhi by [appellant]." It also emphasizes the record contains "[appellant]'s own testimony, deemed not credible, his failure to respond to Feehan's emails and

17

NOV, and his admission in his NOV response that he contracted to perform cleanup services."

NJDEP argues "there is significant circumstantial evidence to show that [appellant] did . . . write the letters," which all contained appellant's name, NJDEP registration number, and his cell phone number, and moreover, that they "purport to conduct business with . . . Derhi, with whom [appellant] admits to having had a prior business relationship." It distinguishes the Dolan case, arguing that in Dolan, "the City of East Orange relied upon an accusatory letter, allegedly authored by another employee, to terminate the employment of the plaintiff," whereas here, the letters were introduced as statements purportedly made by appellant, as opposed to a third person, "raising no issue of cross-examination or confrontation of an accuser."

## III.

"We review a decision made by an administrative agency entrusted to apply and enforce a statutory scheme under an enhanced deferential standard." E. Bay Drywall, LLC v. Dep't of Lab. & Workforce Dev., 251 N.J. 477, 493 (2022). Indeed, we afford "[w]ide discretion . . . to administrative decisions because of an agency's specialized knowledge." In re Request to Modify Prison Sentences, 242 N.J. 357, 390 (2020). Accordingly, "we will disturb an agency's

adjudicatory decision only upon a finding that the decision is 'arbitrary, capricious or unreasonable,' or is unsupported 'by substantial credible evidence in the record as a whole.'" Sullivan v. Bd. of Rev., Dep't of Lab., 471 N.J. Super. 147, 155-56 (App. Div. 2022) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980)).  The burden to show an agency's abuse of discretion "is on the challenger."  Parsells v. Bd. of Educ. of Somerville, 472 N.J. Super. 369, 376 (App. Div. 2022).

The Uniform Administrative Procedure Rules govern evidentiary matters in contested administrative cases.  See N.J.A.C. 1:1-15.1 to -15.12.  N.J.A.C. 1:1-15.5(a) provides "hearsay evidence shall be admissible in the trial of contested cases."  (Emphasis added).  The weight accorded to the admitted hearsay evidence is subject to the judicial determination of "the nature, character and scope of the evidence, the circumstances of its creation and production, and, generally, its reliability."  Ibid.  The regulation further provides that "[n]otwithstanding the admissibility of hearsay evidence, some legally competent evidence must exist to support each ultimate finding of fact to an extent sufficient to provide assurances of reliability and to avoid the fact or appearance of arbitrariness."  N.J.A.C. 1:1-15.5(b).

The "residuum rule" allows hearsay evidence to be "employed to corroborate competent proof, or competent proof may be supported or given added probative force by hearsay testimony." DeBartolomeis v. Bd. of Rev., 341 N.J. Super. 80, 85 (App. Div. 2001) (quoting Weston v. State, 60 N.J. 36, 51 (1972)). Thus, the residuum rule is not used for purposes of assessing admissibility of the hearsay evidence, which is required, but rather to its weight as assessed by its reliability. "The risks of relatively free use of hearsay and other forms of evidence not sanctioned by the Rules of Evidence are mitigated by a correlative standard requiring the existence of some legally competent evidence as the foundation of every adjudicative determination made by an administrative agency." Id. at 84 (citing Reinhart v. E.I. Dupont de Nemours, 147 N.J. 156, 163 (1996)).

We have reviewed the record and are satisfied credible evidence sufficiently supported the ALJ's and Commissioner's determinations, and the decisions did not rest impermissibly on uncorroborated hearsay. First, the evidence supported a finding that the letters were sent by appellant. They bore appellant's name and letterhead, his NJDEP registration number, and his cell phone number, and the letters' contents supported a finding that appellant was the author. The letters were provided by Derhi to investigators, and Derhi

20

reported that he had arranged for appellant to remove the waste from his property. Appellant confirmed his relationship with Derhi, both in his testimony and in his written response to the NOV. He further acknowledged placing a container on Derhi's property, although advancing an alternative explanation for the container. The letters were properly admitted, and the ALJ was permitted to consider them as party admissions as they were sent by appellant.

Next, we deem appellant's reliance on <u>Dolan</u> as misplaced and agree these admissible party admissions are distinguishable from the unsigned and unauthenticated letter written by a non-testifying third party in <u>Dolan</u>, 287 N.J. Super. at 139. Here, appellant suffered no due process deprivation, as the letter was alleged to have been authored by him.

Further, we discern no reason to disturb the credibility determinations of the ALJ as independently adopted by the Commissioner. The ALJ explained he found appellant's testimony "non-sensical" and provided reasons supported by the record for determining that appellant was performing unlicensed solid waste hauling for Derhi. Assessing appellant's testimony as not credible, the ALJ and Commissioner found appellant's claim that he was only moving tree branches implausible under the circumstances. That determination was reasonable based on the evidence as a whole.

Finally, reliance on appellant's testimony was appropriate, as the testimony amounted to non-hearsay substantive evidence that further supported the findings that appellant engaged in unlicensed hauling. Appellant confirmed providing work for Derhi and placing a large storage container on the property. The ALJ and Commissioner found appellant gave "contradictory" accounts of the work he performed at the Derhi property when he stated in his response to the NOCAPA that he "was doing cleanup work at the site," but testified that he "only dropped off the container for welding" and "never said he was doing cleanup." Nevertheless, the testimony corroborated other evidence in the record by confirming the existence of a prior business relationship between Derhi and appellant.

Similarly, appellant's written response to the NOV offered non-hearsay evidence that appellant provided cleanup services for Derhi, corroborating Derhi's claims. Bulk waste gathered on Derhi's property was memorialized in photographs further corroborating the arrangement outlined in the letters. Thus, we are satisfied the determination that appellant engaged in non-self-generated solid waste removal rested on competent evidence, as did the imposition of penalties for the violation.

A-2372-23

As to the penalties, appellant argues the specific assessment of the seriousness of the conduct as "moderate," and the fines imposed commensurate with that degree of violation, were arbitrary and capricious. We disagree.

N.J.A.C. 7:26-5.5(f) requires the NJDEP to "assess a civil administrative penalty for violations . . . on the basis of the seriousness of the violation and the conduct of the violator." Section (g)(2) of N.J.A.C. 7:26-5.5 sets forth the criteria for determining whether a violation is moderate. A violation of moderate seriousness occurs when it:

> i. Has caused or has the potential to cause substantial harm to human health or the environment; or
>
> ii. Substantially deviates from the requirements of the Act[;] . . . substantial deviation shall include, but not be limited to, violations which are in substantial contravention of the requirements or which substantially impair or undermine the operation or intent of the requirement . . . .
>
> [N.J.A.C. 7:26-5.5(g)(2).]

N.J.A.C. 7:26-5.5(h) further delineates between the three levels of seriousness, providing:

> 1. Major conduct shall include any intentional, deliberate, purposeful, knowing or willful act or omission by the violator;
>
> 2. Moderate conduct shall include any unintentional but foreseeable act or omission by the violator; and

3. Minor conduct shall include any other conduct not included in (h)(1) or (2) above.

N.J.A.C. 7:26-5.5(f)(2) sets forth ranges of penalties appropriate for each classification of violation. Generally, "the penalty shall be assessed at the mid-point of the . . . ranges." N.J.A.C. 7:26-5.5(f)(2). The range for moderate penalties is $10,000 to $20,000. Ibid.

The ALJ found:

> N.J.A.C. 7:26-5.4(g) provides for a base penalty for the violation of N.J.A.C. 7:26-3.2(c) of $5,000. This is the amount assessed in the []NOCAPA.
>
> N.J.A.C. 7:26-5.4(g) provides for penalty assessment for the violation of N.J.A.C. 7:26-16.3(a) based upon the seriousness of the violation. [The NJDEP] assessed [appellant] a penalty of $15,000 based upon its determination that the seriousness of the conduct was moderate. . . . My own assessment of the seriousness of the conduct is in agreement that it is moderate. The $15,000 penalty assessed is appropriate.
>
> N.J.A.C. 7:26H-5.18(f) provides for a base penalty of $5,000 for a violation of N.J.A.C. 7:26H-1.6(a) when a first offense. This is the penalty assessed by [the NJDEP] for this violation.

The finding that this conduct fit within the moderate category was supported by the record; accordingly, we conclude the assessment of fees was not arbitrary, capricious, or unreasonable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2372-23